Mark **FOSSON**, **Plaintiff–Appellant**,

v.

**PALACE (WATERLAND), LIMITED,
et al., Defendants–Appellees.**

**No. 94–55550.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 19, 1995.

Decided March 21, 1996.

---

Allen Hyman, Law Offices of Allen Hyman, Studio City, California, for plaintiff-appellant.

Bruce Isaacs, Wyman, Isaacs & Green, Los Angeles, California, for defendants-appellees Fine Line Features, Landmark Theaters Corporation d/b/a Samuel Goldwyn Pavilion Cinema and Cineplex Odeon Corporation.

Gary E. Gans, Richards, Watson & Gershon, Los Angeles, California, for defendant-appellee Film Finances Services, Ltd.

Before: POOLE, BOOCHEVER and O'SCANNLAIN, Circuit Judges.

POOLE, Circuit Judge:

## I. OVERVIEW

Mark Fosson, the composer and copyright owner of a musical composition entitled "Picture of Your Daddy," appeals the district court's order granting summary judgment in favor of all defendants in his copyright infringement action. Fosson sued the defendants under 17 U.S.C. § 101 et seq., seeking $10,000 in damages because of the defendants' substantial delay in paying a $1,250 license fee that the parties had negotiated for use of Fosson's composition in a motion picture. The instant appeal turns on the circumstances under which a subsequent breach of the terms of an express license, which may constitute grounds for rescission, can give rise to a suit for infringement by the licensor. For the reasons discussed below, we affirm the district court's grant of summary judgment in favor of all defendants.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff/Appellant Mark Fosson is the composer and copyright holder of a song entitled "Picture of Your Daddy" ("the Composition"). Defendants/Appellees Palace (Waterland) Ltd., and The Good Film Co., Ltd. (collectively "the Producers") are producers of a motion picture entitled "Waterland," ("the Film") which was released in the United States theatrically in late 1992. Defendant/Appellee Film Finances Services, Ltd. partly financed the production of the Film.[1]

Fosson's Composition was first recorded on an Atlantic Records release in early 1992. In March 1992, a representative of Atlantic Records contacted Fosson's manager, Kathleen Capper, and told her that the Producers would be willing to pay Fosson $1,250.00 to license his Composition for use in the Film's soundtrack. At that time, Capper indicated that Fosson would grant the license in return

---

1. The additional defendants/appellees in this case are Fine Line Features, Landmark Theaters Corporation (d/b/a Samuel Goldwyn Pavilion Cinema) and Cineplex Odeon Corporation (collectively "the Fine Line Defendants"), the distributor and the two exhibitors of the Film, respectively.

Although the Producers, Film Finances, the exhibitors and distributor were all named as defendants in Fosson's suit, the Producers, who have since declared bankruptcy, were never served in the action below.

for prompt payment of the offered fee, and a "music cue sheet" to be provided to Broadcast Music, Inc. identifying Fosson as the composer and allowing him to collect public performance royalties once the Film was released.

In May 1992, the Producers contacted Capper directly. Peter Afterman, acting on behalf of the Producers, sent Capper an unsigned form contract ("the Synchronization License" or "Synch License") dated May 7, 1992. The Synch License-which contains both preprinted and typewritten provisions-grants the Producers the nonexclusive, irrevocable right to use the Composition in the Film. The Synch License also provides that if the Composition was used, the Producers would pay Fosson the agreed license fee of $1,250.00, and provide the music cue sheet upon his written request. Further, the Synch License contains a clause that provides that in the event of any breach by the Producers, Fosson would be limited to his remedies at law, and would have no right to terminate or rescind the contract.[2]

Fosson read the entire Synch License and discussed it with Capper. Thereafter, both Fosson and Capper signed the agreement and Fosson returned it to Afterman in the pre-addressed, postage paid envelope provided by the Producers. Neither Capper nor Fosson ever received a countersigned copy of the Synch License; however, a fully executed copy of the agreement was received by the Film's distributor in June 1992, along with certain other rights clearance documents and materials required in order to "deliver" a motion picture.

Throughout the summer of 1992, Capper made several phone calls to Afterman regarding payment of the $1,250.00 license fee and the music cue sheet. Afterman finally put Capper in touch with the Producers in the United Kingdom, who informed her that the production had gone into receivership and that all outstanding payables were being disbursed by Film Finances, Inc. Capper sent her first written request to Film Finances for payment of the license fee on October 10, 1992.

Receiving no immediate response, Capper sent a second letter on October 20 in which she stated that Film Finances was in breach of the Synch License, and that if payment was not made by October 29, the fee would increase to $10,000.00.[3] Film Finances responded by fax that the person responsible for authorizing payment had been out of town for several weeks, but that he would contact Capper on October 26.

By October 29, Capper still had not received payment. On that date, she sent another letter to Film Finances informing them that they could contact Fosson directly to discuss the licensing fee. In this final letter, Capper did not mention either the $1,250.00 or $10,000.00 license amount.

The Film was released theatrically in the United States on November 6, 1992. Fosson was listed in the Film's credits as the composer and copyright owner of the Composition. To this point, however, no license fee had been paid. Sometime after the release of the Film, Capper turned the matter over to her attorney, Leonard Korobkin. Korobkin wrote a letter to the Producers on November 30, 1992 in which he reaffirmed Fosson's grant of the Synch License in May, and advised them of their subsequent default. However, Korobkin characterized Capper's October 20, 1992 letter as withdrawing Fosson's "offer" to license the Composition for $1,250.00 and substituting a new offer for $10,000.00. Korobkin's letter also demanded that the higher amount be paid within ten (10) days.

On December 10, 1992, Graham Easton of Film Finances faxed a letter to Capper stat-

---

**2.** The relevant portion of the paragraph reads: "11. *Remedies:* [....] In the event of any breach by Company of this Agreement, Licensor shall be limited to Licensor's remedy at law for damaged [sic], if any, and shall not have any right to terminate or rescind this Agreement or to in any way enjoin or restrain the production, distribution, advertisement, telecast, exhibition or other exploitation of the Picture."

**3.** The exact language of Capper's letter was: "Since the film has been released and no payment has been made, you are in breach of our agreement. The fee agreed upon was $1250.00. If we have not received payment in that amount by 29 October 1992, the licensing fee after that date will be $10,000.00."

ing that they would be willing to pay the $1,250.00 contract fee immediately. The following day, however, Capper informed Easton that the matter had been turned over to Korobkin. That same day, Easton, by return fax, reiterated Film Finances's willingness to resolve the matter promptly, and he proposed payment of the contract price by direct bank transfer. Capper did not respond, and on January 21, 1993, Film Finances tendered a check to her for the full license fee of $1,250.00. Korobkin returned the check on February 4, 1993 and renewed the demand for $10,000.00.

The $10,000.00 demand was never satisfied and, in May 1993, Fosson filed an action for copyright infringement in federal district court against the Producers, exhibitors and distributor of the Film, and Film Finances. Based on the foregoing undisputed facts, all the defendants filed motions for summary judgment, and Fosson filed a cross-motion for summary judgment. By order dated March 15, 1994, the district court granted summary judgment in favor of all defendants and denied Fosson's motion. This timely appeal followed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo. *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir. 1994). This court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* at 1130. We are free, however, to affirm on any ground fairly presented by the record. *Jackson v. Southern Cal. Gas Co.,* 881 F.2d 638, 643 (9th Cir.1989).

4. In response to Fosson's argument that the precise language of the Synch License rendered it illusory and unsupported by consideration, the district court stated that "[p]laintiff's position is without merit since he failed to object until after the Producer synchronized the Composition with the Picture." After identifying all the required

## IV. DISCUSSION

In its order of March 15, 1994, the district court found that the written Synch License was a valid contract. The court went on to find that even assuming the Synch License was not valid, Fosson had granted the Producers an implied license to use the Composition in the Film. Either way, the court held, Fosson was precluded as a matter of law from bringing suit for copyright infringement. We address both findings in turn.

### A. Validity of the Written Synch License.

Based on the undisputed evidence, the district court found that Fosson executed the Synch License and, therefore, authorized the Producers' use of the Composition in the Film. Although the court did not expressly find that the Synch License, on its face, was supported by valid consideration,[4] it concluded that a valid contract was formed, and that Fosson was bound by its terms.

Fosson attacks the enforceability of the Synch License on the grounds that: (1) the written agreement served merely as a continuing offer or option that, absent consideration, could be revoked by Fosson at any time prior to acceptance; and (2) the entire agreement was illusory and void for lack of consideration. However, as discussed below, neither of Fosson's contentions has merit.

### 1) Fosson's "Offer Revocation" Theory

Fosson's characterization of himself as offeror of the Synch License is unsupported by law or the facts of this case. Under California law, an "offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *In re First Capital Life Insurance Co.,* 34 Cal.App.4th 1283, 40 Cal. Rptr.2d 816, 819 (1995) (citing Restatement (Second) of Contracts § 24).

elements, the district court *sua sponte* went on to hold that the doctrine of promissory estoppel served as a substitute for consideration in this context. Because we affirm the district court's grant of summary judgment on other grounds, we find it unnecessary to comment further on the issue of promissory estoppel.

■ It is undisputed that the Producers approached Fosson and manifested their willingness to license the Composition for use in the Film. The Producers also proposed the initial license amount of $1,250.00. Further, once Capper indicated that the amount was acceptable, the Producers proposed the additional contract terms for Fosson's acceptance. Thus, because under California law the Producers-and not Fosson-were the offering party, Fosson lacked power to revoke.

Even assuming that Fosson was the offeror, Fosson admits that he did not view Capper's October 20th letter as an attempt to revoke or rescind the Synch License.[5] Thus, even if Fosson's contention had merit, the undisputed facts of the case show that no revocation was attempted.[6]

■ Further, under California law, "acceptance is the 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Id.* (quoting Restatement (Second) of Contracts § 50). Fosson admitted that he read and discussed the terms of the Synch License with his manager Capper. Thereafter, Fosson signed the license and returned it to the Producers in the pre-addressed, postage paid envelope provided. Thus, the undisputed facts tend to show that Fosson manifested his assent to the Producers' terms in the manner invited, and that his assent concluded the offer and acceptance phase of the bargaining.

## 2) Fosson's Contention That the Synch License Is Illusory and Lacks Consideration

■ Fosson's contention that the Synch License lacks consideration is based on the precise language of paragraph 7. The paragraph reads in pertinent part:

> If the Composition is used by Company in the Picture, in consideration of Licensor's execution of the agreement and grant of such license, Company shall pay Licensor [$1250], payable as follows: _____ [blank in original].

Fosson asserts that the language of the paragraph renders the promise illusory because the Producers were not obligated to use the Composition in the Film, nor did the contract specify when payment should be made. The latter proposition is not fatal because, under California law, where no time limit is specified for the performance of an act, a reasonable time is implied. *See Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, 9 Cal.App.4th 373, 11 Cal. Rptr.2d 524, 528 (1992); Cal.Civ.Code § 1657 (1985). Thus, the failure to specify a timeframe for payment of the license fee would not render the contract illusory.

■ The Defendants/Appellees counter that the Synch License should be interpreted as a unilateral contract by which the Producers agreed to pay Fosson $1,250.00 if the Composition was used. Further, the Defendants cite *City of Los Angeles v. Anchor Cas. Co.*, 204 Cal.App.2d 175, 22 Cal.Rptr. 278 (1962) for the proposition that the requirement of mutuality of consideration does not apply to unilateral contracts. *Id.*, 22 Cal. Rptr. at 282. However, the district court did not expressly interpret the Synch License to be a unilateral contract. Moreover, such a finding would be contrary to established principles of contract interpretation in California. *See Patty v. Berryman*, 95 Cal. App.2d 159, 212 P.2d 937, 942 (1949) ("If doubt [exists] as to whether the agreement

---

**5.** The relevant deposition colloquy reads:
 Q So she's affirming that the agreement exists; is that your understanding?
 A She's affirming that it's been breached.
 Q And she's then asking for more money; is that your understanding?
 A Yes.
 Q Is it your understanding in this letter that Kathleen is claiming a breach, she's not attempting to rescind the synchronization license?
 A That's my understanding.

**6.** At oral argument, Fosson maintained his characterization of himself as the offeror in the negotiations between the parties. However, shifting focus from his argument regarding lack of consideration, Fosson extended this characterization by arguing that the Producers (as offerees) never formally accepted his offer to license the composition. Even if accepted, this argument is similarly without merit because the Producers' use of the Composition in the Film prior to Fosson's purported revocation would constitute acceptance of the offer and give rise to an enforceable contract for the $1,250.00 license fee.

was bilateral or unilateral, such doubt would have to be resolved by interpreting the agreement to be bilateral.... There is a presumption in favor of interpreting ambiguous agreements to be bilateral rather than unilateral."). Therefore, absent any evidence to rebut the presumption of a bilateral contract, we cannot conclude that a valid unilateral contract was formed.

 In California, the doctrine of mutuality of obligation requires that the promises on each side of a contract must be binding obligations in order to be consideration for each other. *See* Witkin, Summary of California Law, Contracts § 228 (9th ed. 1987) (citing *Mattei v. Hopper*, 51 Cal.2d 119, 330 P.2d 625, 626 (1958)). "In a bilateral contract, the promise of one party is consideration for that of another." Witkin, at § 215. "[A]ny valid promise, whether absolute or conditional, is sufficient consideration for another promise." *Id.* Moreover, the California Supreme Court has articulated two rules to guide the analysis of conditional promises.

 First, "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bleecher v. Conte*, 29 Cal.3d 345, 213 Cal.Rptr. 852, 698 P.2d 1154, 1156 (1981) (citations omitted). "Second, if a contract is capable of two constructions, the court must choose that interpretation which will make the contract legally binding if it can be so construed without violating the intention of the parties." *Id.*, 213 Cal.Rptr. at 855, 698 P.2d at 1157 (citations omitted).

The California Supreme Court decision in *Mattei*, 330 P.2d at 625 (Cal.1958), is instructive regarding our interpretation of the instant contract provision under the second rule. In *Mattei*, the court held that a contract for the sale of real estate was "neither illusory nor lacking in mutuality of obligation because the parties inserted a provision .... making plaintiff's performance dependent on his satisfaction with the [commercial] leases to be obtained by him." *Id.*, 330 P.2d at 628–29. In other words, although obtaining the leases was completely within the control of

the plaintiff, the court found that "a contract arose, and plaintiff was given the power and privilege to terminate it in the event he did not obtain such leases." *Id.*, 330 P.2d at 626.

Applying the principles of *Bleecher* and *Mattei*, we conclude that paragraph 7 of the Synch License constitutes a valid conditional promise. A reasonable construction of paragraph 7 would be that Fosson would be paid a fee of $1,250.00 in exchange for his grant of the license if, in fact, the Composition was used in the Film. Moreover, paragraph 7 can be read such that neither party would be bound to the terms of the Synch License if the Composition was not used. Similar to the contract provision at issue in *Mattei*, although use of the Composition was within the Producer's discretion and control, we hold that a valid contract arose by virtue of the obligations the Producers agreed to assume in the event the Composition was used. Further, the Producers were under an implied obligation to act fairly to protect Fosson's rights and benefits under the contract.

## B. Non-exclusive Implied License.

The district court also found that even if the written Synch License was invalid, Fosson impliedly granted the Producers a nonexclusive license to use his Composition in the Film by virtue of the fact that he "handed the Composition over to the Producer, intending that the Composition be included with and distributed with the Picture."

Having determined that a license was granted by Fosson, the district court found as a matter of law that Fosson cannot recover for copyright infringement. The Defendants/Appellees and the district court rely primarily on our decision in *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555 (9th Cir.1990), *cert. denied sub. nom. Danforth v. Cohen*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991) ("*Effects II*") for the proposition that once any authorization for use of a copyrighted work is found, the copyright holder is forever barred from bringing suit for infringement. However, such a broad reading of the *Effects II* decision mischaracterizes the holding and the issues raised in that case.

In *Effects II*, a special effects company created film footage at the defendant film producer's request, and handed it over with the intent that the producer use it in his movie. 908 F.2d at 558. There was no oral or written agreement about which party would hold copyright in the work, nor was there an express license granting the defendant the right to use the footage. *Id.* at 556. The defendant was unhappy with some of the footage created, and he expressed his dissatisfaction by reducing the payment the parties had agreed upon for the company's services. *Id.* at 556. The company brought a copyright infringement action, claiming that the producer had no right to use the special effects footage unless the full contract price was paid. *Id.* After resolving the threshold issue of copyright ownership in favor of the special effects company, we held that, given the facts and conduct of the parties, there was an implied license in favor of the producer. *Id.* at 559. The *Effects II* court rejected the company's argument regarding payment by declining to construe payment in full as a condition precedent to the implied license coming into effect. *Id.* at 559 n. 7. The *Effects II* decision does not control the issue presented here of whether a breach of the terms of an express license, which may constitute grounds for rescission, can give rise to a suit for infringement by the licensor for any subsequent use of the copyrighted material.

■ Our recent decision in *Rano v. Sipa Press, Inc.*, 987 F.2d 580 (9th Cir.1993) is dispositive on this issue. In *Rano*, we recognized the rule applied in other circuits that once a non-breaching party to an express copyright license obtains and exercises a right of rescission by virtue of a material breach of the agreement, any further distribution of the copyrighted material would constitute infringement. *Id.* at 586; *See also Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 932–33 (2d Cir.1992); *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1045 (D.C.Cir.1981).

The *Rano* court began its analysis of the copyright infringement claim by analyzing whether Rano had a right to rescind the license and whether, in fact, he had attempted to exercise any such right. *Id.* at 586. In *Rano*, this presented a largely factual inquiry based on the materiality of the defendant's alleged breaches. *Id.* In this case, however, the analysis encompasses both a legal and factual inquiry, both of which must be resolved against Fosson.

■ First, Fosson admitted that he read and understood the Synch License provision in which he waived his right to rescind or terminate the agreement. Having determined the validity of the Synch License, we have previously noted that in California "[a] clear and unambiguous contractual provision providing for an exclusive remedy for breach will be enforced." *See, e.g., Price Dev. Co. v. Redevelopment Agency*, 852 F.2d 1123, 1127 (9th Cir.1988) (citing *Michel & Pfeffer v. Oceanside Properties, Inc.*, 61 Cal.App.3d 433, 132 Cal.Rptr. 179, 184 (1976)). Thus, Fosson had no right to rescind as a matter of law by virtue of his waiver.

■ Second, even assuming that the Producer's breach was material, Fosson stated in deposition that he did not consider Capper's October 20 letter to be a notice of rescission or termination, nor did Korobkin ever state that the license was rescinded. Therefore, according to the undisputed facts, Fosson never attempted to exercise any right of rescission. *See Rano*, 987 F.2d at 586 (noting that Rano clearly attempted to rescind the agreement at issue there).

Accordingly, the district court's grant of summary judgment in favor of the defendants on this issue was proper.

## C. Defendants' Request for Attorneys' Fees.

■ Both the Fine Line Defendants and Film Finances request attorneys' fees as prevailing parties, and on the grounds that the instant appeal was objectively unreasonable and frivolous. *See Fogerty v. Fantasy, Inc.*, —— U.S. ——, —— n. 19, 114 S.Ct. 1023, 1033 n. 19, 127 L.Ed.2d 455 (1994); *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (3d Cir.1986); *Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d

485, 493 (9th Cir.1985). As to Film Finances' involvement, Fosson has articulated no theory of liability that would connect the finance company to the allegedly infringing acts. Thus, Film Finances' request for attorneys' fees on appeal pursuant to 17 U.S.C. § 505 is granted. We remand the issue to the district court for determination of the amount of the fees to be awarded.

We do not find the issues raised on the appeal as to the Fine Line Defendants so lacking in merit that an award of fees is warranted. *See Fogerty*, —— U.S. at —— n. 19, 114 S.Ct. at 1033 n. 19 (factors such as frivolousness, motivation, objective unreasonableness may be used to guide courts' discretion, so long as such factors are applied in an evenhanded manner).

## V. CONCLUSION

We affirm the district court's grant of summary judgment in favor of all defendants. Fosson executed a valid, binding license in favor of the Film's Producers authorizing the use of his Composition. We need not resolve the question of whether the Producers' subsequent delay in paying the agreed license fee constituted a material breach because Fosson expressly waived his right to rescind the contract. Moreover, the undisputed facts show that Fosson never attempted to rescind the agreement.

Film Finances' request for attorneys' fees is granted, and we remand the issue to the district court for determination of the amount.